May it please the court, I'm David Webbert. I'm here with my co-counsel Max Catler. We So, for example, the defendant cites the Brigado case where the First Circuit pointed out that the adverse action began four months before the protected activity. That's a tough case for the plaintiff. First Circuit also mentioned there was no direct evidence and affirmed summary judgment. In the Collins case that the defendant cites, the protected activity occurred a year after the comments showing the retaliatory animus. Once again, not a good combination for the plaintiff. And the court understandably affirms summary judgment. The before and after has to line up for a retaliation case to work. If the person is angry at you about something else, it doesn't really lead to a very good retaliation case for the protected activity. Here we have facts that would allow a jury to rationally find that the before and after do line up exactly with the protected activity and the theory of retaliation. So we have, going back to the year 2000, Mr. McHugh had serious environmental problems with manure management. And this was not just his problem. This was a major problem in Maine going back decades with our dairy farmers. We had a $30 million bond to try to deal with this issue. It's not an easy place. We have a winter, everyone's aware of it this year, but we have a long winter and the ground freezes up and it's just hard to deal with what the cows keep doing all winter. So this has been a huge problem. The Department of Agriculture and the Maine legislature have been very protective of dairy farmers. Somebody could criticize that balancing act and decide that the environment always comes first. But no, that's not the way Maine has looked at it. And so the Department of Agriculture knew that Mr. McHugh, three times in 2000, found manure management problems. The district court found these facts as well, were undisputed in the record. 2003, 2000, I mean, he had serious problems going on. As of February 2006, the Department of Agriculture knew all about these things and said, we're still working with him. And in fact, 2006 was the year that he actually really turned things around because he got a million and a half dollar funding. But as of February 2006, we had emails from the top enforcement person saying, we're working with him. We have plans for getting funding. And the DEP who wanted to go after being their mission, they don't really care about dairy farmers. They really, their focus understandably is on the environmental side. They were saying, we're stuck with this glacial pace at the DOA. They don't, we can't do anything because they control, they protect dairy farmers. And until they hand somebody over, we can't do anything. Then March, Mr. Bradstreet becomes the commissioner. Obviously, he couldn't retaliate until he became the commissioner. A month later, he gets news that he lost. The protected activity came out badly for him. And he owed 7,000 bucks back to Uncle Sam. Within two weeks, the DEP person who had said, you know, we're stuck. There's nothing we can do. Hey, they've handed him over after all. So totally unexpected to the DEP guy. Obviously, the way he worded that and what he said in February, this is glacial, it's going to take forever. So we have an amazing change right there. And then in May, he writes other emails confirming it's always been the policy of the Department of Agriculture to protect these farmers, despite, you know, not just Mr. McHugh, they all have these serious problems. One place, we're paying to ship the manure out. We're doing that because it's such a pro-dairy farmer policy in Maine. But he fell out of their good graces. I don't know how, but they're handing him over for enforcement. So wasn't there some evidence that, in fact, before Bradstreet became the commissioner, that there was some movement in the direction of a less forgiving policy in this case? I completely concede that, and that's why there should be a jury. That's why I didn't move for summary judgment. There are facts that support their side of the story. But what the district court did was grant summary judgment. So I think those facts on the whole support my side of the story, but I admit that they could be looked at either way. So in September of 2005, before Bradstreet, DEP issued a notice of violation. So that's a serious thing. But later, the DOA took it back. It evaporated, the DEP said, because the DOA said, hey, wait a second, don't mess with our dairy farmers. So that evidence actually helps because it shows they knew there were serious problems. DEP cited them for it, and DOA walked it back. It evaporated, pulled it back. So those facts, they can argue that they may win in front of a jury, Your Honor. I'm not making – there are no guarantees, but there should be a jury deciding that, because the facts are not at all clear that that's the way it's – that DEP got its way. They're more the other direction. DEP was saying in February, that thing's gone. We don't have any control over this. It's back at glacial DOA. So, yes, there's a few facts, but the big picture certainly allows the jury to say, he was a – he had serious environmental problems, but the DOA stuck by him. And they also had a policy, Your Honor, they admitted to, that if you're making significant progress on – in environmental compliance, then they have a policy. We're not – we're going to stick by you. And they said – they admitted to that. And in 2006, he got a million and a half bucks. The $450,000 came from the federal government, and then he had a million lined up. $100,000 he got in advance. He bought equipment. And the day before the closing is when they did the revocation. A jury could find rationally that that violates their own policy, when they know the guy's got the money coming, to pull the plug right then after years and years of protecting him. That's before the recusal? That was – well, the recusal. The recusal was – they claim it was at the end of May, although Mr. Bradstreet couldn't remember when it was, and he had other conversations, and he said it may have gone into June or July. But I think they claim it was the end of May when Mr. McHugh requested the meeting. Mr. McHugh didn't find out about it until the June 30 meeting. I'm trying to figure out, prior to whatever you think there is no factual dispute about regarding the recusal, what adverse action occurred to – The most important adverse action. Mr. McHugh is sunk if he doesn't have the protection of the Department of Agriculture. All the dairy farmers are sunk because they're not up – they're just not meeting. So May 10, the policy changed. They're handing him over to DEP. What's the evidence of that? There's an email. The DEP person says it, who's handling – But there's no visible policy action taken? In other words, we don't have a – there's no change of amendment of agreement? There's no formal anything? It's notice from the Department of Agriculture to DEP that they're handing him over. And that's reflected in these emails that say that – they confirm it later in May as well, Your Honor, that this has been – it got from DOA to DEP. I guess I'm not – I know DEP says they're now handing him over. Is that the formal evidence of the retaliatory action that you're talking about, or is there something better than that? The emails that say he's been handed over and we can now move ahead, May 10, May 30, May 31, are the evidence of it. Then June 30, all of a sudden – Is there anything from DOA representing that they have changed their policy? Just DEP knowing about it, Your Honor, but a jury can reasonably look at that. I just wanted to see what the record is. There's nothing from DOA saying we have changed our policy? Well, what we do have, Your Honor, is DOA in February, the top enforcement person responding about a complaint saying, we're working with Mr. McHugh, we're sticking with him, and they knew about all these violations and had not taken any enforcement action. So that suggests that in February he was fine, and then June 30 he has this meeting where he's put under strict scrutiny, so things completely have turned. That's post-recusal? Post-recusal, but it's still very soon after. Pre-recusal, the retaliatory action that you're relying on, is the assumed change in policy that is reflected in DEP's – the DEP email saying it's his understanding that DOA has now changed its policy. But nothing tangible – I'm not saying that therefore you lose. Nothing tangible happens in consequence of that email at that moment. Mr. McHugh knew nothing about it until he filed this lawsuit and got discovery. What he knew was – So the first action that's taken in consequence of the change of policy is post-recusal? Yes. Is that a fair statement of the record? Yeah, that's true. As far as we know. I don't know what else happened internally, but it was a huge change from February to May 10. Suppose all that happened in the case is DOA announced to DEP, and I know this is not what happened, but DOA announced to DEP, or DEP says DOA told them, we're changing our policy. But then, for whatever reason, nothing happens to McHugh. I assume you can't win. Well, the district court, I think, properly found that if Mr. McHugh engaged in protected activity, let's say he said, I voted for so-and-so, I voted for this person for governor, and the commissioner said, okay, we're changing our policy. We protect all dairy farmers except you from DEP enforcement. That would be an adverse action because it would chill protected activity even though it doesn't happen. That would have to be communicated to him. You said it wasn't communicated to McHugh, the change in policy. He never was aware of it. But it was eventually. That's post-recusal. I'm just trying to say, pre-recusal, what you're saying the retaliatory action was, was an uncommunicated internal change in policy. It was secret to us at that point. But that doesn't make it any less evidence that the big change occurred before the recusal than it was implemented after the recusal. Well, I understand that that could go to showing that they had a retaliatory motive for their post-recusal actions. I'm just trying to figure out if we didn't, if one didn't think that, what retaliatory action was taken pre-recusal? The change in policy. That was uncommunicated. It wouldn't have chilled him. But that doesn't make it. It became communicated eventually. So you go back and find out. Who communicated it? On June 30, he shows up at a meeting that he thinks was. But that's post. The people then communicating it are people doing it post-recusal. But they knew about it. That guy was at the meeting. He sent the email, Your Honor. But there would be several questions as to what their motive in communicating it was. But he knew that DOA had handed over on May 10. And he was at the June 30 meeting where Mr. McHugh was told, You're under strict scrutiny. So he was an instrument. He was a key player. They cite him all over their material facts as a key insider. So what he says on May 10 is, I think, a jury can certainly rely on and say, Hey, he's shocked that they've handed him over all of a sudden out of the blue. And then he confirms that in two further emails. So a jury ñ and that's why we have juries in this case. I mean, there's another story. I understand it. They're saying he was so bad for so long we finally got sick of him. And I'm saying they came in and said, We're shocked that it's gambling in here. In other words, they knew all their dairy farmers had huge problems, including Mr. McHugh. And then they turn on him and then they start saying, Oh, my gosh, look at all this manure going around. Well, they knew about it for years. And what changed was he was no longer being protected. And a jury could reasonably find that. They could also reasonably find for the defendant. But post recusal, I guess we have to have some idea, you have to have some evidence, that the people who were communicating the adverse treatment that he was now going to be subject to were doing it for an impermissible purpose under the First Amendment. No, I don't need that. I just need that Mr. Bradstreet changed the policy as of May 10. And then they implemented it. They don't have to have any retaliatory animus. As long as it's in the Supreme Court, it's been very clear. Well, you at least have to have evidence that they were doing it in his direction. He changed the policy. They were just implementing policy at that point. This had to happen at very high up. The throw a dairy farmer overboard. The DEP's emails make it very clear that had to be done at the very top, given the political sensitivity. So a reasonable jury could say, What changed between February and May to make that? A new commissioner who two weeks earlier got a $7,000 bill. And he said, I'm going to bury you. I'm going to put you out of business. That happens, you know, within six months. You know, coincidence happened. But I think a jury could also decide it's not a coincidence. May I ask you what the evidence is on the record about other dairy farmers similarly situated? The evidence that prompts my question is that he had a 500-caliber red eye. There was evidence of sort of mega gallons of liquefied manure being dumped directly into the stream. Thirteen dead cattle lying on the ground when some inspection was made. What evidence is there that there were other dairy farmers in Maine in situations comparable to what I've just described? Let me just first say I'm not relying primarily on that kind of evidence in this case because I have such good other evidence. I realize you're not, but my point is to the extent that you are entitled to fight summary judgment here, we start with a proposition which you candidly acknowledge, that there are sort of two possible sides to the story about the timing. And when we add to that the possibility that there simply is not evidence of comparably egregious violations, do we have a situation in which despite the possible inference, summary judgment might nonetheless be possible? That's why the before picture is so important. I'm assuming that Mr. McHugh was the worst farmer, dairy farmer. I mean, they go on and on in their brief about how bad his record was back to 2000. So this protective policy protected him even though he was the worst. So it's irrelevant if he was the worst or not once they changed that policy, but your honor, there is evidence in the May 31 email of the DEP official who would be knowledgeable about this. He says there are other farms that need a similar approach. So he's saying there are other farms that need to be turned over. So there's evidence right from DEP May 31. For some reason they handed him over. There's other ones we think should be handed over too. So there's some indication that he's not in some unique category, that he is, from the DEP's point of view, they want their hands on more dairy farmers. They can't figure out why DO handed this one over. The jury has a reason why that might have happened. If I could save a couple minutes for rebuttal with my time that's left, your honor. Good afternoon. May it please the Court. Janet Mills for the defendant, Pelley, Seth Bradstreet. Here's how the picture changed, how Mr. McHugh turned things around. On November 15, 2006, a staffer from the Maine Department of Agriculture took a tour of that farm, walked through Country Acres Farm in Dixmont. Thirteen dead cows lay rotting in the farmer's field, fodder for vultures, while a farmhand rolled out a thick layer of additional manure over an already illegal deposit of that substance near a manure pit that was leaking and draining that substance towards Martin Stream, which is a Class A stream, and into the aquifers forming the neighbor's drinking supply. That was, in the uncontroverted evidence, that was the last straw. And it wasn't the first time the inspectors had found animal remains, carcasses, on Mr. McHugh's farm. It wasn't the first time the manure pit had leaked, nor the first time the stream was contaminated, nor the first time neighbors had found Mr. McHugh had polluted their drinking water. Mr. Webber is right. This does go back a ways. But in no sense, under the summary judgment standard, may Mr. McHugh benefit from his own bad behavior, an egregious history of bad behavior. Going back to 1998, when he was first told he needed a livestock permit. 1999, he was reminded of that, didn't do it. 2002, they had an inspection, failed to meet the requirements. 2003, they gave him a provisional permit with a lot of restrictions and conditions. 2005, they saw manure discharging into the Martin Stream, a Class A stream. July 2005, the DEP and the DOA both determined that his farm was one of just four main farms that needed that heightened license as a concentrated animal feeding operation. And in August, they jointly inspected the farm and determined it needed other permits, a NEPDES permit, for instance. In 2005, he filed an application. Yes. I guess what I'm not quite getting at, this arguably is all helpful to Mr. McHugh, in the sense that what it suggests is maybe there is a factual dispute as to whether the last straw was really precipitated by, in fact, it was the last straw or it was precipitated by the fact that there was a new commissioner who added in for Mr. McHugh who became the head of DOA. So what's the state's response to that point? Thank you. You have a couple of egregious and unique facts in this case. One is the longstanding flagrant history of violations, which shouldn't benefit him. I guess it would be helpful for me on this particular point. Since the state didn't do anything, notwithstanding that long history, and then all of a sudden it does do something, that could either be because they finally thought he had crossed the line and it was the last straw. But it just happens that the timing of that change is coincidental with a new commissioner coming in who had this personal dispute with Mr. McHugh. So I guess, again, why isn't there just a factual question as to whether it was the egregiousness of the conduct finally became too much or whether instead it was a new commissioner who had a retaliatory motive? Well, a couple of things, Your Honor, because as of September, as early as September 2005, those two agencies had already agreed and set in motion a different way of enforcing the laws that would have resulted in the same adverse actions towards Mr. McHugh. In September, they met the two departments and agreed that that firm would need permits from both agencies and so that both of them would have enforcement capability. That's an uncontroverted fact. And then later in that same year, there were more violations, which led up to the ongoing series of inspections and violations and ultimately and there was a notice of violation in August 2005 in addition to the three that occurred in 2006. So rather than turn himself around, what I'm saying is, A, there's an assumption made by the appellant that Mr. Bradstreet somehow contaminated, if you will, his previous animus expressed sometime in 2005 towards Mr. McHugh. Once he became commissioner and didn't express any animus towards Mr. McHugh, but somehow that previous episode expression of animosity somehow permeated the entire Department of Agriculture and the Department of Environmental Protection and ultimately the federal EPA. The causal connection here is really missing. In addition, when Mr. Bradstreet became aware, the first time he became aware there was anything involving Mr. McHugh in the Department of Agriculture was when Mr. McHugh asked for a meeting with Mr. Bradstreet. And Mr. Bradstreet did the right thing by saying, I don't want anything to do with it. There were prior dealings that didn't end well or something to that effect. He did the right thing. There is no causal connection. First of all, there's no evidence that Mr. Bradstreet even knew about the emails from the DEP to concerned citizens and whatnot. Of May of 2006, no connection there whatsoever. There's no smoking gun here. There's no email or communication of any kind that says Bradstreet says go get him. Or that the recusal is in any respect pretextual. Nothing of the sort. So, you know, as this court said in Travers, in many cases the lack of such direct evidence linking the person who has expressed some animus to the allegedly retaliatory act would create a fatal gap in proof. It cannot be bridged except through implausible inference or unsupported surmise. That's what we have here. There's not only no... You don't tell us that the policy was changed in 2005, do you? I'm sorry? Was the policy changed in 2005? That DEP email suggesting that they had changed the policy? Yes. With respect to McHugh? There were changes in 2005. He was one of four firms that had to go for an additional permit. And there were conversations and there was a meeting in September of 2005. I'm sorry, the DEP email that they rely on, where the DEP says it looks like they're going to finally give up McHugh. That email is, I think, to a concerned citizen, which is another kind of extraordinary fact we have here. A person uninvolved with Mr. Bradstreet whatsoever who was going gangbusters... So when you say that Bradstreet didn't even know about McHugh having any business before the Department of Agriculture until that June 30th meeting, their claim is, based on that DEP email, that there was a DOA change in policy with respect to McHugh prior to that June 30th date, right? That is their claim. And does the state have a view about whether there was a change in policy prior to June 30th? Yes, we believe that there was a gradual change of policy commencing in 2005, and it's reflected in the uncontroverted documents. It's reflected in Shelley Doak's affidavit, which is uncontroverted. She's the chief agricultural nutrient management enforcer. So in other words, that change in policy could have occurred without the Agriculture Commissioner knowing about it? In fact, it did. In both instances, the communications reflecting a change because of the egregious nature of flagrant violations of Mr. McHugh's history is reflected in two documents, the September and the May minutes of a meeting and an agenda, and the emails referred to by Mr. Weber. But there's no indication, no evidence whatsoever that Mr. Bradstreet knew anything of that. In fact, I think the uncontroverted testimony is the first time he even got wind that there was any pending matters before the Department of Potential Matters involving Mr. McHugh was when Mr. McHugh asked for that meeting in June, and he said, I've got nothing to do with it, and don't let anybody talk about it even in the hallways when I'm around. I don't want to hear anything about it. He did the right thing. And so the causal connection here between the alleged animus and the adverse actions, clearly there were adverse actions, is completely broken, not only by his recusal, but by the intervening factors of this citizen complainant who repeatedly emailed both departments, not the commissioner but the departments, and went to the governor saying, my God, this guy's polluting the stream. He's polluting the drinking water in my town. You've got to do something. That started in mid-2005 and continued on through 2006. And then the EPA, which is not under Mr. Bradstreet's jurisdiction or authority, he has no control over them, and the EPA and the DEP, two intervening agencies over which Mr. Bradstreet, had he chosen to get involved, had he not recused himself, would have had no say in. So there are those breaks in the causal connection. And finally, there's also obviously, as the judge below ruled, the fact that even with respect to the one adverse action that the court below found, and we dispute that there was a causal connection there, but even if you assume there was a causal connection between Mr. Bradstreet's animus expressed five, six months before and the May emails, whatever they do reflect, that the Department of Agriculture and ensuing departments of DEP and EPA would have taken, inevitably would have taken the same adverse action, even absent Mr. McHugh's appeal to the U.S. Department of Agriculture the year before. This conclusion was appropriate. It was based on undisputed facts, and I believe it should be upheld. The undisputed testimony is that Mr. McHugh's farm, that the compliance matters there were the worst of its kind, worst of their kind in Maine, the most flagrant and notorious violations on record. Witnesses from the departments said they had never had experience with another farm with such an egregious record of repeated and continued noncompliance, and which had generated as many complaints from the public as this one did. It's the only farm in Maine ever to be sued by the EPA for violation of the Clean Water Act, not because of Mr. Bradstreet was sitting in the commissioner's office at the Department of Agriculture, but because of Mr. McHugh's own uncontroverted, flagrant violations of law, and then to be held in contempt in federal court of the order that the EPA and Mr. McHugh agreed to. That is unusual, untoward, and justifies what happened to him. So the history of violations here are important. His continued failures to comply with the law. Now, Mr. Webber has said, well, he was trying to turn things around. He didn't turn things around. Those cows were still dead in the field. There were carcasses. There was manure leaking from the pits heading to the stream. All those violations continued. And in 2006, quite aside from Mr. Bradstreet at all because he had no dealings with this, but Mr. McHugh continued to fail to comply with the permits, continued to follow a nutrient management program, completely failed to report all these discharges which neighbors and the EPA was seeing. The EPA was involved in this or had an interest in this as early as February 2006 and maybe earlier according to some of the emails. They had taken an interest in this farm. It was so egregious that there were so many failures to report discharges, failures to dispose of dead carcasses. There were five different observations during the latter part of 2006 about manure discharges, which he had not reported. All of those things led to his, the adverse actions of which he truly complains, and that is the denial of his permit, revocation of his permit, and the denial of a, the waiver of a ban on winter spreading. So you have here a failure of causation. You can't just guess at these things. This court has said you've got to prove that the protected conduct was a substantial or motivating factor in the adverse action. That kind of causal connection is completely lacking here. Mr. McHugh asks that summary judgment be overturned because there is mere speculation, pure speculation and hypothesis of the sort that this court has discouraged in other cases. You don't have somebody who is out there in a rage as you had in Travers saying, get that guy, get that guy, and having that kind of animus permeate the department or permeate the company in question. You don't have that. In fact, you have the opposite. You have a guy who did the right thing, who said, I had some dealings with him, didn't talk about the details, didn't say I'm going to get him and go get him. There's no smoking gun here. It would be a different case if Mr. Bradstreet had pretended to recuse himself and then still got involved in the cases, but he did not. There's no evidence that he did. All of the enforcement people testified that he stayed right out of it and they never talked with him about it whatsoever. Thank you. You reserve 10 seconds, but we'll give you a minute and a half. I'll be very quick. Brian Wright was a disinterested, one of the best dairy farmers in Maine. I put his declaration in the addendum to the brief. It's the first part of that. He is an eyewitness that Mr. McHugh was making great progress. He had offered to help out and that he thought in a few months he would have had it all set with compliance and that he saw this as totally discriminatory the way the Department of Agriculture was treating that dairy farmer compared to himself and other dairy farmers. So that's additional evidence on the disparate treatment. Number two, the recusal was untimely. It was after this huge change, and I don't think e-mails are nothing. I think in the modern world, e-mails are where truth is mostly found as opposed to affidavits written later. But those three e-mails are evidence and they predate the recusal. And then finally on the recusal, I am very thankful that Judge Lopez did not say he was recusing because he has hard feelings towards me and they can't be worked out. Because if he had said something like that, I think it would have not been a real recusal. It would have been, boy, am I in big trouble given how popular Judge Lopez is. So this was not a recusal of, and he said he had done it before, I'm recusing myself. Because he had good relations with certain people. They were friends, and that would have been the right way to do it. He said to his secretary and to his deputy, sour business relationship, hard feelings. And then the deputy declared that to everybody on the DOA team who then heard that the commissioner had such a bad relationship with this guy that he recused himself. And so that is not a recusal that you can count on to break a causal chain. Thank you. Thank you.